### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DENNIST D. MITCHELL, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 09-CV-513-PJC |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | ) |
| Defendant. | ) |

### OPINION AND ORDER

Claimant, Dennis D. Mitchell ("Mitchell"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Mitchell's application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Mitchell appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Mitchell was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

At the time of the hearing before the ALJ on April 10, 2008, Mitchell was 45 years old. (R. 799, 803). Mitchell completed tenth grade and obtained a GED. (R. 806). At the hearing, the first reason he gave for his inability to work was his neck and shoulders. (R. 807). Mitchell testified that he had surgery on his neck and shoulders twice. *Id.* He had pain and limited range of motion. (R.

808). He also had difficulties with his hands and fingers. *Id.* In an accident with an auger, two fingers of his right hand were crushed and one finger was amputated and reattached. *Id.* He had problems with grip. *Id.* On his left hand, he cut his fingers in 2006 doing maintenance work and had problems with gripping with that hand. *Id.* Due to those injuries, he used the index finger and thumb of his left hand for tasks such as opening the refrigerator door. *Id.* He testified that he had injuries to his left hip and leg from an old injury, he had an old injury to his right knee, and he believed that his right knee had cartilage issues. (R. 808-09). He also had liver problems, to which he attributed mental issues such as difficulty with concentration and memory. (R. 809). He also had pain in his abdomen. (R. 818-19). The abdominal pain made it difficult to bend over. (R. 819). He also had problems with nausea, fatigue, and depression. *Id.*

At a supplemental hearing on October 21, 2008, Mitchell testified that he was experiencing psychological issues at the time of the hearing. (R. 839). He said that he had not slept much the night before. *Id.* Mitchell testified that he had begun psychological appointments at Family and Children's Services ("FCS") and had been diagnosed with bipolar disorder and post-traumatic stress disorder ("PTSD"). (R. 837). Mitchell testified that the PTSD related to an incident in which he was attacked by two men in 2001 and severely injured. (R. 838). He experienced flashbacks a couple of times a month. (R. 846). At the supplemental hearing, he testified that his problems with nausea and diarrhea ranged from daily to weekly in occurrence. (R. 849-50). There would be several times a month that he would not leave his house due to physical or mental issues. (R. 850).

Mitchell's sister testified at the supplemental hearing and stated that she had observed increased confusion in Mitchell during the year before the hearing. (R. 853-54). She believed he was having increased problems with basic activities of daily living, and she cited his difficulty

concentrating. (R. 854). She believed he had lost weight due to constant pain and nausea. *Id.*

A treadmill cardiac test was conducted at Southcrest Hospital on February 15, 2005, apparently after an episode of chest pain. (R. 338). The study was negative, and Mitchell was considered to have good functional capacity. (R. 339). An echocardiography procedure done on the same date showed normal left and right ventricular systolic function, and diastolic function appeared normal. (R. 340-41). The report noted "a bicuspid aortic valve with mild aortic regurgitation, but no stenosis. The aortic root and ascending aorta are mildly dilated." (R. 341).

Mitchell was seen and apparently kept overnight at Saint Francis Hospital in December 2005 when he had an episode of chest pain while lifting a heavy object at work. (R. 123-24). He later developed right-sided neck pain, and he gave his medical history as including two previous neck surgeries. (R. 123). On physical examination, Mitchell had some tenderness in his neck, but full range of motion. *Id.* Myocardial infarction was ruled out. (R. 124). A dobutamine stress echo test was considered normal. (R. 129). Heart and lung structures were unremarkable in a chest x-ray. (R. 134). Four views of Mitchell's cervical spine resulted in findings of post-surgical changes and degenerative changes. (R. 135). The cervical spine x-rays showed evidence of spondylosis at the C4/C5 and C6/C7 levels, and neural foraminal encroachment at the C5 through C7 levels on both the left and right sides. *Id.* An MRI of the cervical spine showed a narrowing of the spinal cord at the C6/C7 level. (R. 136).

According to a discharge summary, Mitchell was hospitalized at Saint Francis hospital from April 25 to May 8, 2006 and was discharged to a skilled nursing facility. (R. 155). He had been diagnosed with pneumonia and had tested positive for methicillin-sensitive staphylococcus aureus (MSSA). *Id.* The discharge diagnoses were possible infected endocarditis; newly-acquired hepatitis

B; lumbago; bipolar disorder; history of intravenous drug use; and bicuspid aortic valve. *Id.*

A second discharge summary reflected that Mitchell was admitted to skilled nursing on May 8, 2006 and discharged on June 12, 2006. (R. 192). The discharge diagnoses were infective endocarditis with MSSA; pulmonary nodules; and chronic pain. *Id.* The discharge summary said that he had been admitted for completion of intravenous antibiotics and that his discharge condition was good. *Id.*

The results of a colonoscopy completed on June 30, 2006 were normal. (R. 210). The administrative transcript includes a one-page report from Richard L. Cooper, D.O. who apparently examined Mitchell in connection with Mitchell's right-sided abdominal pain and did an ultrasound procedure on July 11, 2006. (R. 211). Dr. Cooper reported that the visualized portions of Mitchell's liver appeared grossly normal, and there was a mild thickening of the gallbladder. *Id.*

A follow up pulmonary examination was conducted on August 24, 2006. (R. 363). Pulmonary function tests were consistent with mild obstructive defect, and the assessments were emphysema, cavitary lung lesions, and endocarditis. *Id.*

A discharge summary reflects that Mitchell was hospitalized at Southcrest Hospital from September 1 through September 7, 2006. (R. 289). The discharge diagnoses were intractable nausea and vomiting; bilateral upper abdominal pain; abnormal liver function tests; and hepatitis C and hepatitis B. *Id.*

Mitchell was again briefly hospitalized September 30 and October 1, 2006 with a complaint of mental status change and multiple falls with lacerations. (R. 319). After administration of Lactulose, a protein-restricted diet, and IV hydration, Mitchell improved and was discharged. (R.

4

317). Discharge diagnoses were hepatic encephalopathy,[1] with mental changes secondary to this; fall with laceration; and hepatitis C and hepatitis B. *Id.* Records indicate that multiple x-rays and a CT scan of Mitchell's brain were taken around this time due to trauma. (R. 330-37). The view of the cervical spine was considered to show postoperative changes, but no acute abnormality, while the skull series demonstrated no significant abnormality. (R. 330-32). X-rays of Mitchell's left hand and right leg showed no significant abnormality, and a chest x-ray was negative. (R. 334-35, 337). A CT scan of Mitchell's brain was considered unremarkable. (R. 336).

Mitchell apparently was hospitalized at Saint Francis overnight October 18-19, 2006 after an episode of chest pain. (R. 404). A CT scan of Mitchell's chest showed no evidence of a pulmonary embolus. (R. 414-15). The impressions were abdominal and chest pain, chronic lung disease, chronic obstructive pulmonary disease ("COPD"), and endocarditis. (R. 405).

Records of David A. Traub, M.D. show that he saw Mitchell on November 6, 2006, and that Mitchell requested that Dr. Traub take over pain control management relating to his chronic neck pain. (R. 437). Dr. Traub agreed to manage Mitchell's prescription pain medications and administered a suprascapular nerve block. *Id.* Dr. Traub repeated the nerve block procedure on January 31, 2007. (R. 436).

Mitchell was hospitalized December 29-31, 2006 at Saint Francis (R. 418). The treating physicians believed that his condition was due to his COPD with exacerbating acute bronchitis. *Id.* He was hospitalized at Saint Francis from March 1-3, 2007 due to abdominal pain. (R. 448). Discharge diagnoses were pyloric ulcer and gastric bezoar with abdominal pain secondary to those

---

[1]Taber's Cyclopedic Medical Dictionary indicates that hepatic encephalopathy is akin to hepatic coma, which is "[i]mpaired central nervous system function due to liver disease." Taber's Cyclopedic Medical Dictionary 636, 885 (17th ed. 1993).

5

conditions; hepatitis B and hepatitis C; stable bipolar disorder; and stable COPD. *Id.*

On June 15, 2007, Mitchell was treated at the emergency room at Saint Francis after having an accident on an ATV. (R. 586-601). He then returned with abdominal pain on June 19, 2007. (R. 573-85). A CT scan without contrast of Mitchell's abdomen and a CT scan with contrast of Mitchell's pelvis were conducted on June 19, 2007. (R. 577-78). There was no acute pathology of Mitchell's abdomen, but the pelvis CT scan showed "colonic wall thickening, focally, and the cecum which is horizontally oriented and probably hypermobile." (R. 578).

Mitchell was seen at the emergency room at Saint Francis on October 18, 2007 with pain in his right wrist and shoulder due to injury. (R. 559-66). An x-ray of his right wrist showed no acute fracture or dislocation. (R. 560). X-ray of his right shoulder showed no significant radiographic abnormality. (R. 561).

Mitchell was hospitalized at Saint Francis December 18-19, 2007 for chest pain with shortness of breath. (R. 542). He again was ruled out for a pulmonary embolism. The discharge diagnoses were an exacerbation of his COPD that was resolving; history of hepatitis; musculoskeletal chest pain; continued tobacco use; and slight increased size in the aorta. *Id.*

Mitchell presented to the emergency room at Saint Francis on May 24, 2008 complaining of right wrist and hand pain after falling down stairs. (R. 742-60). He was diagnosed with a distal radial fracture. (R. 744). Mitchell presented at Saint Francis on May 27, 2008, with concern that he might be developing pneumonia because he had symptoms of a cough with chills and sweating. (R. 672). On June 5, 2008, Mitchell apparently presented at the Saint Francis emergency room for rebandaging of his right wrist. (R. 668). The physician stated Mitchell had films with him "of a distal radius and ulnar styloid." *Id.* Mitchell was given pain medication. *Id.*

6

Various intake forms were completed by Mitchell with FCS in April 2005. (R. 255-70). A treatment plan dated April 21, 2005 showed Mitchell's Axis I[2] diagnoses as bipolar disorder I, most recent episode depression, with psychotic features; and methamphetamine dependence. (R. 258). An Axis II diagnosis was deferred, and Mitchell's global assessment of functioning ("GAF")[3] was shown as 51 currently and highest level in the past year. *Id.*   Other records showed that Mitchell received prescription medication management from FCS through 2009. (R. 213-54, 271-88, 602-16, 656-66, 684-95, 770-98).

Janice B. Smith, Ph.D., a nonexamining agency consultant, completed a Psychiatric Review Technique form on March 8, 2006, stating that there was insufficient evidence that Mitchell had an affective disorder pursuant to Listing 12.04. (R. 140-53).

Mitchell was seen by agency consultant Jeri Fritz, Ph.D. on March 21, 2007. (R. 466-69). Dr. Fritz's examination indicated that Mitchell had the ability to understand and follow directions. (R. 467). His attention and concentration were within normal limits, "such that [Mitchell] would be able to perform simple, repetitive tasks." (R. 467-68). Dr. Fritz estimated that Mitchell's ability to relate to others was good and his ability to handle stress was fair. (R. 468). Dr. Fritz stated Mitchell's Axis I diagnoses as bipolar disorder by history and panic disorder with agoraphobia by history. *Id.*   Mitchell's GAF was assessed as 75. *Id.*

---

[2]The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

[3]"The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" *Langley v. Barnhart*, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004), *quoting* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed. 2000).

An agency nonexamining consultant completed a second Psychiatric Review Technique form on April 25, 2007, finding that Mitchell's affective disorder and anxiety disorder were not severe. (R. 471-84). For the "Paragraph B Criteria,"[4] the consultant assessed Mitchell with a mild degree of limitation in his activities of daily living, in his social functioning, and in his concentration, persistence or pace. (R. 481). The consultant noted no episodes of decompensation. *Id.* In the "Consultant's Notes" portion of the form, the consultant noted some of the treatment records from Laureate, and summarized the report of Dr. Fritz. (R. 483).

Mitchell was seen by agency consultant Angelo Dalessandro, D.O. for an examination on May 11, 2007. (R. 490-97). Dr. Dalessandro stated that Mitchell's chief complaint was his liver disease. (R. 490). On examination, Dr. Dalessandro noted tenderness of Mitchell's abdomen on palpation and the size of Mitchell's liver. (R. 492). There was tenderness in examining Mitchell's cervical spine, with decreased range of motion. *Id.* Mitchell's right elbow and both shoulders were tender, with normal range of motion. *Id.* There was some tenderness in Mitchell's legs and knees. *Id.* Dr. Dalessandro's impressions were chronic hepatitis A and B by history; "[p]ost status gastric ulcers"; "[r]ule out osteoarthritis"; emphysema by history; and "[r]ule out bipolar disorder by history." *Id.*

A nonexamining consultant completed a Physical Residual Functional Capacity Assessment

---

[4]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

on June 6, 2007. (R. 499-506). The consultant found Mitchell's exertional limitations to be consistent with sedentary work. (R. 500). In explanation of this determination, the consultant noted Mitchell's allegations and his multiple hospitalizations related to his history of hepatitis, and he summarized the report of Dr. Dalessandro. (R. 500-01). He found no other limitations. (R. 501-06).

On July 14, 2007, S. Krishnamurthi, M.D. completed a Physical Medical Source Statement. (R. 507-09) and written interrogatories. (R. 510-12). Dr. Krishnamurthi indicated that Mitchell could sit for one hour at a time and could stand or walk for 10-30 minutes at a time. (R. 507). Within an 8-hour day, Mitchell could sit for a total of 6 hours, and could stand and walk for a total of one hour each. *Id.* Mitchell could frequently lift or carry 5 pounds and occasionally lift or carry 10 pounds. *Id.* Dr. Krishnamurthi found no restrictions on Mitchell's use of his hands or feet. (R. 508). He found that Mitchell could only occasionally bend, squat, crawl, climb or reach. *Id.* His opinion was that Mitchell had a mild restriction on exposure to dust and fumes. *Id.* In the space asking for objective medical findings that supported his RFC evaluation, Dr. Krishnamurthi appeared to summarize the consultative examination of Dr. Dalessandro. *Id.* Dr. Krishnamurthi also cited to specific records in the spaces for objective evidence that supported Mitchell's subjective complaints and for other remarks. (R. 509). In the interrogatories, he was asked to list impairments that were demonstrable by objective evidence. (R. 511). His responses are not entirely legible, but they appear to list hepatitis, COPD, bicuspid aortic valve, and bipolar disorder. *Id.* In his opinion, none of these impairments equaled a Listing. *Id.*

Mitchell was seen for another examination by agency consultant John W. Hickman, Ph.D. on May 30, 2008. (R. 617-27). Some of the testing was affected by Mitchell's right hand being in

9

a sling at the time of the examination. *Id.* Scores for attention, concentration, and memory were in the average or low average ranges except that he had marked impairment of his "incidental visual spatial memory." (R. 620). His MMPI profile was indicative of an individual who is "likely to evidence a thought disorder with paranoid features." (R. 622). Dr. Hickman's diagnoses on Axis I were pain disorder associated with both psychological and medical factors; mixed type bipolar disorder; anxiety disorder with panic attacks; history of alcohol dependence and remission by claimant report; history of methamphetamine dependence and remission by claimant report; and nicotine dependence. (R. 622-23). On Axis II, Dr. Hickman noted features of an antisocial personality disorder. (R. 623). He assessed Mitchell's GAF as 55 and noted "marked mood and personality difficulties." *Id.*

Agency consultant E. Joseph Sutton, II, D.O. examined Mitchell on June 30, 2008. (R. 640-53). Dr. Sutton noted his inability to examine Mitchell's right wrist because it was in a cast and sling. (R. 642). He found Mitchell's range of motion to be normal except with respect to his neck. *Id.* He believed that Mitchell's fine motor coordination was normal, and he noted that Mitchell could not effectively grasp with his right hand because of the recent fracture. *Id.* Dr. Sutton's medical impressions were structural pain with complaints in the neck, shoulder, and knee; history of hepatitis; acute fracture of right wrist; history of bipolar disorder; COPD; asthma; tobacco use; and peptic ulcer disease with a history of bleeding. (R. 643).

At the time of the examination on June 30, 2008, Dr. Sutton completed a form indicating that in an 8-hour work day Mitchell could sit, stand, and walk for 2 hours at a time, sit for a total of 8 hours, and stand and walk for a total of 6-8 hours. (R. 651). His opinion was that Mitchell could lift or carry up to 10 pounds frequently, and up to 25 pounds occasionally. *Id.* He found no

restrictions in Mitchell's use of his feet or hands for repetitive movements. (R. 652). Mitchell could bend, squat, crawl, climb, or reach occasionally, and Dr. Sutton found no restrictions for environmental factors. *Id.*

On October 19, 2006, Mitchell's treating physician at the time, Theresa A. Cooper, D.O. wrote a "To Whom It May Concern" letter stating that Mitchell had been hospitalized "several times for beginning stages of liver failure. His prognosis is poor at this time." (R. 416).

Dr. Traub prepared a report dated October 13, 2008. (R. 683). After listing several specific medical problems that Mitchell had and referring to Mitchell's mental health issues and a report of Dr. Bryan Cates, Dr. Traub stated:

> Based on the history and physical exams that I have done of Mr. Mitchell, and also based on the information in his medical records, it is my opinion that he is unemployable at this time. I do not think his employability will improve in the future either. He is not able to conduct himself with a physical job, even to the extent that it would require simple tasks. He is ill-suited for a light-duty position, such as office work, due to his various medical problems.

*Id.*

## Procedural History

According to the ALJ's decision, on December 16, 2005, Mitchell filed an application seeking supplemental security income under Title XVI, 42 U.S.C. §§ 401 *et seq.* (R. 15). The application was denied initially and on reconsideration. (53-55, 58-61). A hearing before ALJ John W. Belcher was held April 10, 2008 in Tulsa, Oklahoma, and a supplemental hearing convened on October 21, 2008. (R. 799-869). By decision dated January 22, 2009, the ALJ found that Mitchell was not disabled at any time through the date of the decision. (R. 15-24). On June 15, 2009, the Appeals Council denied review of the ALJ's findings. (R. 5-7). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[5] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported

---

[5]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

At Step One, the ALJ found that Mitchell had not engaged in any substantial gainful activity since the application date of December 16, 2005. (R. 17). At Step Two, the ALJ found that Mitchell had severe impairments of hepatitis B and C; cirrhosis; status post fusion in cervical spine - degenerative disc disease; status post bilateral shoulder surgeries; alcohol abuse; amphetamine abuse in remission; emphysema / COPD; anxiety with panic attacks; and pain disorder. *Id.* At Step Three, the ALJ found that Mitchell's impairments did not meet a Listing. (R. 18).

The ALJ determined that Mitchell had the RFC to do sedentary work:

> except lift/carry 10 pounds occasionally, less than 10 pounds frequently; pushing/pulling limitations consistent with lifting/carrying; stand/walk for two hours out of an eight hour day; sit for six hours out of an eight hour day; occasionally climb, balance, bend, stoop, crouch, kneel, and crawl; and occasionally avoid fumes, odors, dusts, toxins, and gases. Mentally, he could do simple tasks in a habituated and object oriented work setting requiring no safety operations and hypervigilence. He could have superficial contact with co-workers and supervisors and no contact with the public.

(R. 20-21). At Step Four, the ALJ found that Mitchell was not able to perform any past relevant

work. (R. 23). At Step Five, the ALJ relied on the testimony of the vocational expert ("VE") that there were jobs in significant numbers in the economy that Mitchell could perform. (R. 23-24). Therefore, the ALJ found that Mitchell was not disabled at any time from the application date of December 16, 2005 through the date of his decision. (R. 24).

## Review

While Mitchell raises numerous issues on appeal, the Court finds that the ALJ's decision must be reversed because the hypothetical posed to the VE did not include all of the limitations ultimately found by the ALJ in his RFC determination. Because reversal is required based on this issue, the other issues Mitchell raises on appeal are not addressed.

At Step Five of the sequential evaluation process, the burden is on the Commissioner to show that work exists in significant numbers in the regional and national economies which the claimant can perform, taking into account the claimant's age, education, work experience and RFC. *See Dikeman*, 245 F.3d at 1184; *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). When the ALJ relies on the testimony of a vocational expert (the "VE") as evidence at Step Five, the hypothetical question to the VE must "relate with precision all of a claimant's impairments." *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (quotation omitted). If the hypothetical question does not include all of the claimant's impairments, then the testimony of the VE cannot be substantial evidence to support the Commissioner's decision at Step Five. *Id.*

The ALJ's RFC determination is quoted previously in this Opinion and Order, and it is uncontested by the parties that the hypothetical to the VE did not include the italicized portion of this sentence: "Mentally, he could do simple tasks in a habituated and object oriented work setting *requiring no safety operations and hypervigilence*." (R. 21, 862-63). The words "requiring no

safety operations and hypervigilence" had enough significance to the ALJ that he included them in his RFC determination. The Court cannot know if these words would have had significance to the VE, and whether they would have affected the VE's testimony regarding the numbers of jobs that Mitchell could perform, because those words were not included in the hypothetical to the VE. Thus, the hypothetical did not "relate with precision" all of the impairments that the ALJ found, and therefore the testimony of the VE cannot be substantial evidence at Step Five. *Hargis*, 945 F.2d at 1492. *See also Bowers v. Astrue*, 271 Fed. Appx. 731, 733-34 (10th Cir. 2008) (unpublished) (inclusion of "simple work" requirement in hypothetical to VE was not adequate when the claimant had a serious impairment of concentration and attention that was not included in the hypothetical).

The Commissioner's briefing on this issue concedes Mitchell's point and makes his argument for him:

> Plaintiff claims that the ALJ erred in not including in his hypothetical question the restriction that he avoid work that involves safety operations and hypervigilance. The ALJ specifically asked the vocational expert to consider that Plaintiff was limited to simple tasks in a habituated work setting. Nothing in the occupational descriptions of optical goods assembler or semiconductor bonder indicates that an individual would be required to perform safety operations or maintain hypervigilance in the jobs. Plaintiff's assertion that the additional safety and hypervigilance limitations "if presented to the VE, would have excluded the jobs listed" is speculative and unsupported. The Court should reject Plaintiff's unfounded claim about what the vocational expert would have testified.

Response Brief, Dkt. #17, p. 4. (Citations omitted).[6] In his Reply Brief, Mitchell clarified the point

---

[6] The Court is troubled that the Commissioner in his brief did not cite or discuss any of the authorities cited by Mitchell in his Opening Brief relating to this question. Mitchell cited *Qualls v. Apfel*, 206 F.3d 1368, 1373 (10th Cir. 2000), rather than *Hargis*, the Tenth Circuit case cited by this Court, for the principle that a VE's testimony cannot serve as substantial evidence to support the ALJ's decision at Step Five if the hypothetical question to the VE did not recite all of the claimant's impairments. The Commissioner gave no explanation for why the requirement stated in *Qualls* did not apply to this case. The Commissioner did not cite to any authority in making the suggestion that the Court look to the DOT descriptions of the jobs to

about whether the inclusion of the omitted language in the hypothetical to the VE would have changed the VE's testimony, stating that there was no way to predict what the VE's testimony would have been. This is exactly the point of the rule that all impairments must be related with precision. It is the Commissioner's burden at Step Five to prove that there are jobs in significant numbers in the economy that the claimant can perform. In a case such as this, with nonexertional impairments, the only way the Commissioner can carry this burden is through the testimony of a VE. If all of the impairments are not included, then the VE's testimony is not substantial evidence that allows the Commissioner to carry his burden.

This Court will not accept the Commissioner's invitation to look at the descriptions for the two jobs to which the VE testified and make a determination of whether those jobs would be affected by impairments relating to safety operations and hypervigilance. Doing so would "overstep our institutional role and usurp essential functions committed in the first instance t the administrative process." *See Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004). In *Allen*, there were errors regarding some of the jobs upon which the ALJ had relied in finding that thee were jobs in significant numbers that the claimant could perform. *Id.* at 1143-44. The Tenth Circuit rejected the Commissioner's argument that it could supply the missing dispositive finding, stating that it was the

---

determine for itself whether there was any requirement related to safety operations or hypervigilance. When, as in this case, there is Tenth Circuit case law, cited by the claimant in his opening brief, that seems to be controlling and to require reversal, the Court believes that the Commissioner has an ethical duty to discuss that precedent and to explain why it is inapplicable. To do otherwise is to file a frivolous brief. *See U.S. v. Nicholson*, 272 Fed. Appx. 732, 737 (10th Cir. 2008) (unpublished) (pleading is "frivolous if it is contrary to established law and unsupported by a reasoned, colorable argument for change in the law"); *Flores v. Astrue*, 246 Fed. Appx. 540, 543 (10th Cir. 2007) (unpublished) ("A party's failure to cite any authority 'suggests either that there is no authority to sustain its position or that it expects the court to do its research.'") (citation omitted).

ALJ's primary responsibility to determine the question of work in significant numbers in light of the case-specific considerations. *Id.* at 1145. Here, the determination of significant numbers of jobs should be determined as part of the administrative process, using a hypothetical question to the VE that includes all of the limitations found by the ALJ, and not by this Court.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

Because the error of the ALJ related to the hypothetical posed to the VE requires reversal, the undersigned does not address the remaining contentions of Mitchell. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Mitchell.

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 17th day of September, 2010

Paul J. Cleary
United States Magistrate Judge